## Robert N. Center v. Mad River Corporation

[561 A.2d 90]

No. 87-044

Present: **Allen, C.J., Peck, Gibson and Dooley, JJ., and Barney, C.J. (Ret.), Specially Assigned**

Opinion Filed March 10, 1989

Motion for Reargument Denied April 18, 1989

*Dorothy L. Helling* of *Theriault & Joslin, P.C.*, Montpelier, for Plaintiff-Appellee.

*King & King*, Waitsfield, for Defendant-Appellant.

**Gibson, J.** Defendant appeals from a jury verdict awarding plaintiff $17,000 after finding that defendant was unjustly enriched when it refused to renew lease and license agreements with plaintiff. We reverse.

### I.

In 1976, plaintiff purchased a small cross-country ski operation at the Tucker Hill Lodge in Fayston, Vermont. He spent the next several years expanding and developing the business into a viable Nordic ski center, operating under the name "Tucker Hill Ski Touring Center."

During the winter of 1980-81, plaintiff decided to expand his ski trails to include neighboring areas, including the Mad River Glen downhill skiing resort, located only two miles from Tucker Hill. As he had done with other neighboring landowners over whose land he wished to groom and use ski trials, plaintiff asked

the defendant corporation to sign a license agreement (designated a "Special Use Permit") allowing use, for the ski season, of portions of its land. In addition, defendant orally leased plaintiff a portion of the building called the "Mad River Barn," in which plaintiff set up a second ski touring center.

This second center, which plaintiff also called the Tucker Hill Ski Touring Center, consisted of one room of a condominium building from which plaintiff's employees rented out cross-country ski equipment, sold passes to the trails, and gave instruction in Nordic and Telemark skiing. In addition, plaintiff ran numerous cross-country and Telemark competitions and other special events relating to Nordic skiing out of the center.

This arrangement continued in essentially the same form for the next three ski seasons, with some minor changes. First, the name of the business operated by plaintiff out of the Mad River Barn was changed in 1982, at defendant's request, to "Mad River Glen Nordic Center." Second, the trail system developed by plaintiff increased with each passing year, until by the 1983-84 ski season, over twenty kilometers of cross-country and Telemark trails were in use over defendant's land. Third, the lease agreement for the 1982-83 season was reduced to writing, and provided for renewal "on such terms and conditions as may be mutually agreed upon." A written lease was proposed by defendant for the 1983-84 season, but was not executed by the parties, who could not agree on two provisions.[1] Instead, the parties agreed to another oral lease, consisting of the terms of the proposed lease absent the two disputed provisions.

The 1983-84 ski season ended in the spring of 1984. In August of 1984, plaintiff had lunch with defendant's general manager, and was told that his lease and license agreements were not going to be renewed. Plaintiff then received a letter, dated August 24, 1984, from defendant's president, confirming that the lease would not be renewed because the "uncertainty surrounding the format of future operation of the Barn" was causing defendant to recon-

---

[1] One provision provided that plaintiff waived any right to counterclaim for betterments under 12 V.S.A. § 4811 and agreed that any such improvements would immediately become defendant's property without compensation to plaintiff. The second disputed term provided that any alterations, improvements or permanent fixtures added to the property would become defendant's property upon the expiration of the lease, unless defendant exercised its option to require plaintiff to remove such fixtures at its sole expense.

sider the nature of the Nordic operation, since the corporation was "not prepared to aggressively pursue a commercial type [cross]-country or touring center" at that time.

When the lease and license agreements were not renewed, plaintiff sold some of the inventory from the Mad River Barn operation (consisting of cross-country equipment, retail items, and his snow machine and grooming equipment), as well as the name Tucker Hill Ski Touring Center and his inventory from that operation, to Tucker Hill Lodge for $24,000. He also sold a portion of the equipment located at the Mad River Barn to the defendant, along with some ski racks, boxes and trail signs.

This lawsuit was precipitated when, despite the language in its August 24th letter to plaintiff, defendant began running a similar Nordic operation in the 1984-85 ski season out of the Mad River Barn. Plaintiff sued defendant for damages, alleging an obligation on defendant's part to renew the lease and/or license agreements based on plaintiff's reasonable expectations arising from the course of conduct between the parties over the four-year period. Plaintiff claimed damages based on the value of the benefits conferred upon defendant which, he contended, defendant wrongfully retained after failing to renew the lease and license agreements. Those benefits included increased patronage and visibility to the defendant corporation as a whole, the goodwill value of the business, increased profits to defendant, and improvements to the Mad River Barn.

After the close of all the evidence, defendant moved for a directed verdict. The trial court granted the motion as to all claims of breach of an express or implied-in-fact contract, but denied the motion as to the quasi-contract[2] claim and submitted the case to the jury on that theory. The jury returned a verdict in plaintiff's

---

[2] As we have recently had occasion to note, there exists some confusion over the interrelationship among the terms "quasi-contract," "unjust enrichment," "restitution" and "quantum meruit." See *In re Estate of Elliott,* 149 Vt. 248, 252 and 253 n.2, 542 A.2d 282, 285 and 285 n.2 (1988). The trial court here used the term "quasi-contract" interchangeably with the theory of recovery known as "unjust enrichment" or "restitution," which is consistent with our case law. See *id.* at 252, 542 A.2d at 285 (involving a "quasi-contract theory of unjust enrichment or restitution" under which the " 'law implies a promise to pay when a party receives a benefit and the retention of the benefit would be inequitable.' ") (citation omitted); compare Restatement of Restitution § 1 (1937) ("[a] person who has been unjustly enriched at the expense of another is required to make restitution to the other."). See generally Restatement of Restitution, "The Right

favor in the sum of $17,000. Defendant made a timely motion for judgment notwithstanding the verdict (judgment n.o.v.), which was denied. This appeal followed.

Defendant raises three issues on appeal. First, it contends that in the absence of an express agreement to the contrary, neither a licensee nor a lessee has a legally enforceable right to renewal or to compensation for the value of improvements made to the property. Second, it asserts that there can be no quasi-contract if an express agreement on the same subject matter existed between the parties. Finally, defendant claims that an incorrect measure of damages was used by the jury. Because we find the first issue dispositive of this appeal, we do not reach the others.

## II.

Plaintiff alleged that three distinct business relationships existed between him and defendant: first, the licensor-licensee relationship created by the annual "special use permits"; second, the lessor-lessee relationship created by the express lease agreements; and third, a not-readily-definable relationship which arose out of the efforts of plaintiff and defendant, individually and jointly, to develop complementary skiing opportunities, Nordic and Alpine, at plaintiff's place of business and defendant's adjoining Alpine ski resort. While plaintiff offered extensive evidence of these shared undertakings and allged mutual benefits, he did not claim either in the complaint or at trial that he and defendant were partners or engaged in a joint venture.

Plaintiff has claimed that he had "reasonable expectations," given the prior conduct of the parties, that his business relationship with defendant would continue indefinitely. In response, defendant has consistently claimed that their relationship was governed by the terms of the leases and license agreements, which plaintiff admits contained no provisions requiring their annual renewal. The trial court dismissed all of plaintiff's claims based on the express agreements between the parties — i.e., the leases and licenses — and plaintiff has not cross-appealed from that decision.

The nub of plaintiff's argument appears to be that the "ongoing business relationship" between the parties, while not rising to the

to Restitution (Quasi Contracts and Kindred Equitable Relief)," at 4-10 (1937); 1 G. Palmer, The Law of Restitution § 1.2 (1978 & Supp. 1988).

level of a legally recognizable partnership or joint venture, gave rise to a duty on defendant's part either to renew continuously the lease and license agreements or, in the event that nonrenewal occurred, to compensate plaintiff for the benefits conferred by him upon defendant. Nowhere in the record, however, can we find a legal or evidentiary basis upon which to predicate such a duty.

What plaintiff asked the jury to do was find that even in the absence of any formal relationship between the parties, it was somehow unfair for the defendant to refuse to renew its lease and license agreements with him and then, later, decide to operate a similar business out of the same location. While it is possible to sympathize with plaintiff's predicament, it was well within his power to protect himself from this legitimate business risk. He could have insisted on an express renewal provision; he could have negotiated a noncompetition clause in the lease agreement; he could have bargained for a contract term compensating him for improvements or for his business's goodwill; he could have entered into an express or implied partnership agreement with defendant dealing with these business risks.

Plaintiff did none of these things. Instead, when defendant decided to exercise its legal right not to renew the lease and license, plaintiff sued alleging that some inarticulable business relationship — not a partnership, not a joint venture, not governed by any express agreement — required that he be compensated because he could no longer run his cross-country ski business out of the Mad River Barn and over Mad River Corporation property.

We cannot find, on the record before us, any evidence that defendant's actions in failing to renew the agreements between the parties were not within its legal rights. Nor is there any evidence that defendant was under any sort of duty not to compete with plaintiff which would have restricted its legal capacity to operate a similar Nordic operation after the agreements between the parties lapsed. We must conclude, therefore, that there was no inequity in the dealings between the parties.

In order to prevail on a quasi-contract claim, the trial court instructed the jury that plaintiff must prove that (1) a benefit was conferred on defendant; (2) defendant accepted the benefit; and (3) defendant retained the benefit under such circumstances that it would be inequitable for defendant not to compensate plaintiff for its value. See *In re Estate of Elliott,* 149 Vt. at 252, 542 A.2d at 285; *Hedges* v. *Schinazi,* 144 Vt. 605, 607, 481 A.2d 1046, 1048

(1984); *Cedric Electric, Inc.* v. *Shea*, 144 Vt. 85, 86, 472 A.2d 757, 757 (1984).

Motions for judgment n.o.v. raise substantially the same legal questions as motions for a directed verdict under V.R.C.P. 50(a) and are treated alike. *Kinzer* v. *Degler Corp.*, 145 Vt. 410, 412, 491 A.2d 1017, 1018 (1985). In reviewing the granting or denial of such motions, we must view the evidence in the light most favorable to the nonmoving party (here, the plaintiff) and exclude the effect of any modifying evidence. *Id.* If any evidence fairly or reasonably supported plaintiff's claim of unjust enrichment, judgment n.o.v. would be improper. *Id.* at 412-13, 491 A.2d at 1019; *Senesac* v. *Associates in Obstetrics & Gynecology*, 141 Vt. 310, 312, 449 A.2d 900, 902 (1982).

Despite this demanding standard of review, we conclude from our review of the proceedings that there was no evidence to support a finding of inequity under the circumstances. Since a finding of inequity is required in order for plaintiff to prove damages under a quasi-contract theory, see *Estate of Elliott*, 149 Vt. at 252, 542 A.2d at 285, it was error for the trial court to deny defendant's motions for directed verdict and judgment n.o.v. on this claim.

*Reversed and remanded with directions to enter judgment in favor of defendant.*